Michael J. Bettinger (SBN 122196)
*mbettinger@sidley.com*
Irene Yang (SBN 245464)
*irene.yang@sidley.com*
Sue Wang (SBN 286247)
*sue.wang@sidley.com*
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, California  94104-1715
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

Andrew T. Langford (*pro hac vice*)
alangford@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone:  (214) 981-3300
Facsimile:   (214) 981-3400

Attorneys for Plaintiff Magento, Inc.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| X.COMMERCE, INC. D/B/A MAGENTO, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>EXPRESS MOBILE, INC.,<br><br>Defendant. | Case No.: 3:17-cv-02605-RS<br><br>**PLAINTIFF MAGENTO'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**<br><br>Assigned to:  Hon. Richard Seeborg<br>Date:  May 23, 2018<br>Time:  9:30 a.m.<br>Courtroom:  3, 17th Floor |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................................... 1

II.   BACKGROUND .................................................................................................... 1

III.   APPLICABLE LEGAL STANDARDS ................................................................ 2

IV.   CONSTRUCTION OF CLAIMS ......................................................................... 3

    A.   "virtual machine" –'397 Patent Claims 1, 2, and 37............................................ 3

        1.   Technical background. .................................................................. 4

        2.   The specification supports Magento's construction. .................... 4

        3.   Express Mobile's arguments about the specification are baseless............. 5

        4.   The applicant distinguished prior art during prosecution based on the use of compiled code. ................................................................. 6

        5.   Express Mobile cannot identify a virtual machine that does not execute compiled code. ........................................................................ 7

        6.   Express Mobile has already lost this issue in another court ...................... 7

    B.   "runtime engine" –'168 Patent Claim 1; "run time engine" –'397 Patent Claim 24.................................................................................................................... 8

        1.   The "runtime engine" contains previously compiled code in the instruction set of the virtual machine.............................................. 8

        2.   The "runtime engine" reads the claimed "database." .............................. 10

    C.   "at least one run time file" –'397 Patent Claims 1-2; "one or more run time files" –'397 Patent Claim 37 ................................................................................ 11

        1.   Run time files are created before a browser is pointed to a webpage....... 11

        2.   Files that cannot be executed are not run time files.................................. 12

    D.   "database" – '397 Patent Claims 1, 2, 3, 9, 14, and 37; '168 Patent Claim 1....... 14

    E.   "contemporaneously" – '397 Patent Claim 37...................................................... 15

    F.   "substantially contemporaneously" — '397 Patent Claims 1 and 2 .................... 17

    G.   "button" — '397 Patent Claims 6, 9, 14, 17, and 20; '168 Patent Claims 1-3 ..... 19

    H.   "settings" – '397 Patent Claims 1, 2, 9 and 37 .................................................. 19

    I.   "multimedia objects" – '397 Patent Claims 4 and 5 ........................................... 20

i

J.     "timelines" / "time lines" – '397 Patent Claims 11, 14-15, 17 and 20; '168 Patent Claims 1 and 3 .......................................................... 21

V.    THE DECLARATION OF EXPRESS MOBILE'S EXPERT, AS WELL AS ITS OVERLONG BRIEF, SHOULD BE STRICKEN ........................................ 23

VI.   CONCLUSION.................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Labs. v. Andrx Pharms., Inc.,*
   473 F.3d 1196 (Fed. Cir. 2007) ------------------------------------------------------------- 22

*Amgen Inc. v. Hoechst Marion Roussel, Inc.,*
   457 F.3d 1293 (Fed. Cir. 2006) ------------------------------------------------------------- 21

*Amtel Corp. v. Info. Storage Devices, Inc.,*
   198 F.3d 1374 (Fed. Cir. 1999) -------------------------------------------------------------- 3

*Berkheimer v. HP Inc.,*
   881 F.3d 1360 (Fed. Cir. 2018) ------------------------------------------------------------- 18

*CCS Fitness, Inc. v. Brunswick Corp.,*
   288 F.3d 1359 (Fed. Cir. 2002) --------------------------------------------------------19, 21

*Core Wireless Licensing S.A.R.L. v. Apple Inc.,*
   Case No. 15-cv-05008-PSG, 2016 WL 3124614 (N.D. Cal. June 3, 2016) ------------------- 18

*Datamize, LLC v. Plumtree Software, Inc.,*
   417 F.3d 1342 (Fed. Cir. 2004) ------------------------------------------------------------- 18

*Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.,*
   34 F.3d 1048 (Fed. Cir. 1994)--------------------------------------------------------------- 3

*France Telecom, S.A. v. Marvell Semiconductor, Inc.,*
   No. 12-CV-04967-WHO, 2014 WL 1007449 (N.D. Cal. Mar. 12, 2014) --------------------- 22

*Interval Licensing LLC v. AOL, Inc.,*
   766 F.3d 1364 (Fed. Cir. 2014) ------------------------------------------------------------- 18

*Largan Precision Co., Ltd. v. Fujifilm Corp.,*
   2012 WL 4097719 (N.D. Cal., Sept. 17, 2012) ------------------------------------------24, 25

*Markman v. Westview Instruments, Inc.,*
   517 U.S. 370 (1996) ----------------------------------------------------------------------- 2

*Multiform Desiccants, Inc. v. Medzam, Ltd.,*
   133 F.3d 1473 (Fed. Cir. 1998) ------------------------------------------------------------22, 23

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
   134 S. Ct. 2120 (2014) ------------------------------------------------------------------- 3, 18

*Pall Corp. v. Micron Seps.,*
   66 F.3d 1211 (Fed. Cir. 1995)-------------------------------------------------------------18, 19

*O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008) ------------------------------------------------ 10

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
  467 F.3d 1355 (Fed. Cir. 2006) ------------------------------------------------ 24

*ONE-E-WAY, INC. v. Int'l Trade Comm'n*,
  859 F.3d 1059 (Fed. Cir. 2017) ------------------------------------------- 18, 19

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) --------------------------------------------- 2, 3

*Poly-America, L.P. v. API Indus., Inc.*,
  839 F.3d 1131 (Fed. Cir. 2016) --------------------------------------------------- 3

*Prolifiq Software Inc. v. Veeva Sys. Inc.*,
  No. C 13–03644 SI, 2014 WL 3870016 (N.D. Cal. Aug. 6, 2014) ----------------------------- 21

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
  511 F.3d 1132 (Fed. Cir. 2007) ----------------------------------------- 22, 23

*Tristrata, Inc. v. Microsoft Corp.*,
  No. 11-CV-03797-JST, 2013 WL 12172909 (N.D. Cal. May 13, 2013) --------------------- 24

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) --------------------------------------------- 2, 3

**Other Authorities**

Fed. R. Civ. P. 16(f) ------------------------------------------------------- 24

Fed. R. Civ. P. 37(c)(1) --------------------------------------------------- 24

Patent L.R. 4-2 ------------------------------------------------------------ 24

Patent L.R. 4-2(b) --------------------------------------------------------- 24

Patent L.R. 4-3 ------------------------------------------------------------ 25

Patent L.R. 4-5(b) ----------------------------------------------------------- 1

## I.     INTRODUCTION

Pursuant to Patent Local Rule 4-5(b), Plaintiff X.Commerce, Inc. d/b/a Magento, Inc. ("Magento") respectfully submits this brief in support of its proposed constructions for the 10 most significant terms identified in the Joint Claim Construction Statement. ECF No. 59 at 1. Although the parties have identified additional terms that may require construction, they have agreed to focus briefing and argument on 10 terms for purposes of this claim construction process. In Magento's view, some of the terms identified by Defendant Express Mobile, Inc. ("Express Mobile") are not among the 10 most significant terms in this case. Nevertheless, as the parties agreed that each side would propose five terms for construction in the first instance, those terms are discussed here.

## II.     BACKGROUND

Magento is the leading platform for e-commerce innovation, integrating online and physical shopping features to provide customers with a unique and rich e-commerce experience. Merchants, on their own or with assistance from Magento's solution partners, can use Magento's technology to build and deploy custom e-commerce sites. Magento's Enterprise Edition technology (now known as Commerce), which has been accused of infringing claims of U.S. Patent Nos. 6,546,397 ("the '397 patent") and 7,594,168 ("the '168 patent") (collectively, the "asserted patents"), includes a full slate of e-commerce features. However, the Enterprise Edition technology that Magento provides does not generate or render websites or web pages—any such technology is outside of Magento's control. And use of the Enterprise Edition technology requires technical savvy. It is not as simple as dragging and dropping elements to visually create a website, as contemplated by the asserted patents.

After Express Mobile sued numerous Magento solution partners and specifically identified Magento's Enterprise Edition technology as part (though not all) of the accused functionality, Magento brought this action to protect its solution partners and clear a cloud over its technology. Express Mobile has continued its campaign against Magento's Enterprise Edition in the meantime, filing numerous additional cases against Magento's solution partners since this suit was filed.[1]

---

[1] Solution partners are third parties with a contractual relationship to Magento, under which they are permitted to solicit business using Magento's trademarks and provide services to Magento's customers in connection with setup, customization, and operation of Magento technology.

The '397 and '168 patents share a specification and claim priority to December 1999. They are directed to "a method and apparatus for designing and building a web page . . . using a browser-based build engine." ECF No. 61-2 ('397 patent) at Abstract, 1:7-8. The browser-based build engine is described as written in the Java programming language, a "full-featured programming language" widely used by the industry before 1999. *Id.* at 1:52-54. The "entire web site build process is WYSIWYG (what you see is what you get), with the web designer working directly on and with the final web page." *Id.* at 2:34-37. The interface creates "a set of interface objects with a look and feel that is identical to that of MS Windows." *Id.* at 2:51-53, 17:31-34. According to the patents, "data produced by the build engine is processed and ultimately placed into a multi-dimensional array structured database, and stored in an external file." *Id.* at 2:37-39. The patents describe features that take advantage of known technologies such as scaling to browser window size or screen resolution, "browser based interface objects that visually and behaviorally are identical to those of the MS Window's standard," and file size reduction, which was a built-in feature of the Java programming language. *Id.* at 1:52-3:62:27-30. Figures 37-63 are claimed to be "screen shots of the user interface presented by the build process." *Id.* at 5:34-37. A Java-based "runtime engine" is created and then downloaded with the database to end users' browsers to display webpages. *Id.* at 5:53-62.

## III.    APPLICABLE LEGAL STANDARDS

Claim construction is a matter of law. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). Claim terms are "generally given their ordinary and customary meaning." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Claim construction begins with the intrinsic evidence, which consists of the claim language, the patent specification, and prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. Outside of this general rule, a patentee may act as his own lexicographer or disavow the full scope of a claim term in the specification or prosecution history. *Poly-America, L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016). A disavowal requires "clear and unequivocal evidence that the claimed invention includes or does not include a particular

feature," though the disavowal "need not be explicit." *Id.* "When the meaning of words in a claim is in dispute, the specification and prosecution history can provide relevant information about the scope and meaning of the claim." *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

The intrinsic evidence alone will often resolve claim construction disputes. *Vitronics*, 90 F.3d at 1583. However, extrinsic evidence may be used to guide the meaning of a claim term, although it is less reliable than intrinsic evidence. *Phillips*, 415 F.3d at 1318-19. Extrinsic evidence should be evaluated in light of the intrinsic evidence and should not be relied on to contradict the meaning of claims as discerned from the claim language, specification, and prosecution history. *Id.* at 1319; *Vitronics,* 90 F.3d at 1583. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

A claim is invalid for indefiniteness if, "read in light of the specification delineating the patent, and the prosecution history, [it] fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). Indefiniteness "is a legal conclusion that is drawn from the court's performance of its duty as the construer of claims" and is thus appropriately addressed at the claim construction stage. *Amtel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1378 (Fed. Cir. 1999).

## IV.   CONSTRUCTION OF CLAIMS

### A.   "virtual machine" –'397 Patent Claims 1, 2, and 37

| Express Mobile's Proposed Construction | Magento's Proposed Construction |
|---|---|
| an abstract machine that is not built in hardware but is emulated in software | An abstract machine emulated in software that executes compiled code |

The parties' dispute about the term "virtual machine" boils down to whether a virtual machine must execute compiled code, that is, human-readable source code that has been converted to a form that can be input to, and executed by, the virtual machine. It does, because all virtual machines do this, as shown by the intrinsic and extrinsic evidence. Declaration of Philip Greenspun ("Greenspun Decl.") ¶¶ 27-65.

### 1. Technical background.

Software programs are written in human-readable source code. Greenspun Decl. ¶ 27. "Real" machines, such as Intel processors, however, do not understand human-readable source code, and instead recognize and execute pre-defined sets of instructions written in machine code peculiar to a given real machine. *Id.* ¶¶ 28-31. For a software program to be executed on a real machine, the source code has to be compiled into the real machine's instruction set. *Id.* ¶ 28.

A virtual machine is a hypothetical or abstract machine implemented in software, and, like a real machine, a virtual machine has its own instruction set and does not understand human-readable source code. *Id.* ¶¶ 32-33. As with a real machine, software source code has to be compiled into the instruction set of the virtual machine so that the virtual machine can understand and execute it. *Id.* ¶ 33. One benefit of a virtual machine is that programs written for a virtual machine can be executed on different platforms without modification. *Id.* ¶ 34.

A well-known virtual machine at the time of the '397 patent was the Java Virtual Machine ("JVM"). *Id.* ¶ 35. The JVM ran programs written in the Java programming language, but the JVM itself did not understand Java source code. *Id.* ¶¶ 36-41. The JVM understood only its own instruction set, called "bytecode." *Id.* Hence, the source code of a Java program had to be compiled into bytecode before it could be input to and executed by the JVM. *Id.*

### 2. The specification supports Magento's construction.

The claims themselves reveal no intent to depart from the plain and ordinary meaning of "virtual machine," and the specification is consistent with a person of ordinary skill's ("POSA's") usual understanding that a virtual machine executes compiled code. As Express Mobile admits, the embodiment in the specification uses the JVM, which executes compiled code (bytecode). ECF No. 61 ("Op. Br.") at 12; Greenspun Decl. ¶¶ 35-36. Indeed, the lone reference in the specification to a virtual machine is to the "JAVA Virtual Machine." '397 patent at 35:34-38. As explained in connection with "runtime engine," the specification teaches that webpages are displayed by executing a runtime engine, which is created by compiling Java source code into bytecode (the instruction set of the JVM). Magento's construction is supported by the specification and does not read out any embodiment.

4

### 3. Express Mobile's arguments about the specification are baseless.

Express Mobile first incorrectly reads the specification to teach that some code executed by a virtual machine is not compiled. First, Express Mobile points to the following:

> The customized run engine and a library of the referenced run time classes are compiled and converted into byte code at **165**. Finally, the run time engine for the web site is created at **166**. ***The required set of class objects required at run time is flagged for inclusion into the CAB/JAR file*** (See FIG. 27).

'397 patent at 43:28-32 (emphasis added). The specification however, subsequently confirms that "the required set of class objects" is actually compiled, and so Express Mobile is incorrect:

> The feature flags are analyzed at **176** to determine which JAVA classes ***have been compiled*** (See Fig. **25**). ***These class files*** are flagged for compression and inclusion in the library CAB and JAR files.

'397 patent at 44:41-45 (emphasis added). Express Mobile also relies on the following specification passage to argue that not all code for the virtual machine is compiled:

> FIG. 27 describes the processes for creating the CAB and JAR Files (**33**a of FIG. **4**). ***The image objects, if any,*** which were defined on the first internal web page are analyzed at **175**. If they are set to draw immediately upon the loading of the first web page, then they ***are flagged for compression and inclusion in the CAB and JAR Files.***

'397 patent at 44:36-41 (emphasis added). The bolded statement, however, actually refers to image files.

> ***These CAB and JAR Files contain*** the compressed versions of all necessary JAVA class files, ***image files***, the "Websitename".class, customized run time engine file, and the "Websitename".dta database file.

'397 patent at 44:47-50 (emphasis added); *see also* Greenspun Decl. ¶¶ 59-64. As Express Mobile later admits in connection with "at least one run time file," image files cannot be executed. Op. Br. 22. While a program running in the JVM can *read* an image file, the JVM does not *execute* anything but compiled code, and the JVM cannot *do anything* without receiving an instruction in Java bytecode. Greenspun Decl. ¶¶ 33, 64. For example, an image file would not be read unless the JVM received an instruction to do so in bytecode. *Id.* ¶ 64. Express Mobile points to no teaching in the specification that an image file is un-compiled code executed by a virtual machine.

Second, Express Mobile relies on the specification's references to "full-featured

5

1    programming languages," but fails to produce from those statements any evidence of a virtual

2    machine executing non-compiled code. The examples of "full-featured programming languages" in

3    the specification are Java, C++, and Visual Basic. '397 patent at 1:23-25, 52-54. Source code in all

4    of these languages must be compiled before a machine can execute it. Greenspun Decl. ¶¶ 44-47.

5           Third, Express Mobile argues that the JVM could execute compiled code *or* "interpreted

6    code," so Magento must be unduly limiting the claims to one type of code. This argument is just

7    misleading wordplay. Instructions input to the JVM are *always* in bytecode, which is compiled code.

8    Greenspun Decl. ¶¶ 52, 54, 58. A just in time ("JIT") compiler can *further* translate that bytecode

9    into platform-specific machine code "just in time" for execution, which can be a more efficient way

10   to execute a program. *Id.* ¶¶ 55-57. Either way, the input to the JVM is always bytecode. *Id.* ¶¶ 58.

11   Express Mobile merely calls bytecode "interpreted code" instead of compiled code and attempts to

12   create the incorrect illusion that Magento is seeking to overly limit the claims. Its arguments about

13   the "Java Native Interface" are similarly unavailing. *Id.* ¶ 53.

14           **4.      The applicant distinguished prior art during prosecution based on the use
                     of compiled code.**

15

16          The prosecution history also shows that the applicant understood the claimed invention to

17   require compiled code. The '397 patent faced multiple rejections during prosecution over the prior

18   art Faustini patent. The embodiments in Faustini are all implemented using Java, which Faustini

19   teaches is "a compiled language." ECF No. 61-5 ("Faustini") at 7:47-52. To distinguish Faustini, the

20   applicant stated that in his invention, "[t]he run time engine is used to accept the attributes ***and***

21   ***generate virtual machine commands***, which then generate a display." ECF No. 61-4 at 5 (emphasis

22   added). He went on to state that his invention "permitt[ed] the user of the claimed invention to

23   change the attributes of the web page without requiring a ***recompilation*** of the run-time code [*i.e.*,

24   the runtime engine]." *Id.* The applicant thus recognized that the runtime engine is compiled code, as

25   it must be since a virtual machine does not understand instructions unless they are in compiled code.

26   Otherwise, the applicant presumably would have distinguished Faustini on the grounds that his

27   invention did not require compiling code at all.

28          Express Mobile argues about whether Magento can use the above prosecution record to

1    establish a disclaimer. Regardless of whether it is called a formal disclaimer, the applicant's

2    statements are part of the intrinsic record and consistent with Magento's proposed construction.

3         **5.    Express Mobile cannot identify a virtual machine that does not execute**
          **compiled code.**

4

5         Tellingly, Express Mobile did not identify any virtual machine that executes un-compiled

6    code. The extrinsic evidence also overwhelmingly favors Magento's construction.

7         Express Mobile argues that "[v]irtual machines were well known . . . and [had] been

8    developed for many programming languages, including Java, O-code, and Pascal." Op. Br. 11. But

9    this supports Magento. Java, as explained, must be compiled to bytecode for the JVM to understand

10   it. Greenspun Decl. ¶¶ 48-49. Pascal also must be compiled. *Id.* "O-code" is not a "programming

11   language" at all, but rather is itself compiled code in the form of a virtual machine instruction set. *Id.*

12   Express Mobile further argues that "[v]irtual machines have since been developed for a number of

13   other programming languages." Op. Br. 11. That is also wrong, as the languages mentioned by

14   Express Mobile are designed to operate with the JVM, not some newer virtual machine. Greenspun

15   Decl. ¶ 65. Finally, Express Mobile offers the conclusory assertion that "virtual machines can utilize

16   various types of code as input." Op. Br. 14. But it provides no evidence of a virtual machine that

17   does not execute compiled code. Greenspun Decl. ¶ 52. Express Mobile's expert parrots its

18   arguments and he is incorrect for the same reasons. *Id.* ¶¶ 44-59.

19        The smattering of dictionary definitions relied on by Express Mobile also support

20   Magento's construction. All of them recognize that a virtual machine does not execute human-

21   readable source code.[2] The extrinsic evidence supports Magento.

22        **6.    Express Mobile has already lost this issue in another court**

23        Finally, Express Mobile already lost this issue in another litigation. In particular, a Texas

24   district court found the "evidence strongly indicates a virtual machine executes intermediate code,"

25   which the court described as "the instruction set of the virtual machine." Declaration of Andrew T.

---

26   [2] *E.g.*, ECF No. 61-12 at 802 ("Pascal was compiled into P-code, the instruction set of the virtual
     machine"); ECF No. 61-13 at 532 ("generating a simple invented pseudo-code is easier than
27   generating real machine code"); ECF No. 61-14 ("An abstract computing machine for which an
     interpreter exists.").

28

Langford ("Langford") Ex. C at 9, 10. The Texas court ultimately construed virtual machine as an "abstract machine that is emulated in software and that executes intermediate code." *Id.* at 10. Magento here proposes "compiled code" in its construction because it is clearer and more tied to the intrinsic and extrinsic evidence than "intermediate code."

B.   **"runtime engine" –'168 Patent Claim 1; "run time engine" –'397 Patent Claim 24**

| Express Mobile's Proposed Construction | Magento's Proposed Construction |
|---|---|
| a file that is executed at runtime that facilitates retrieval of information from the database and generates commands to display a web page or website | A file containing compiled code that, when executed at runtime in the browser, reads information from the database and calls previously compiled code in the instruction set of the virtual machine, which is executed by the virtual machine to display a web page or website |

There are two primary disputes. First, does a runtime engine contain previously compiled code in the instruction set of the virtual machine (it does). Second, does the runtime engine read information directly from the claimed database (it does).[3] Magento's construction of "runtime engine" is consistent with the specification and prosecution history, while Express Mobile's overbroad construction departs from the intrinsic record. Greenspun Decl. ¶¶ 66-77.

**1.   The "runtime engine" contains previously compiled code in the instruction set of the virtual machine.**

Here again, another court already rejected Express Mobile's position and found that a "'runtime engine' necessarily includes compiled code in the sense that it includes code in a form that may be executed by a real or virtual machine." Langford Ex. C at 13. This Court should likewise reject Express Mobile's attempt to exceed the legitimate scope of "runtime engine."

The specification teaches that the runtime engine is a file containing previously compiled code in the instruction set of the virtual machine. Greenspun Decl. ¶¶ 67-70. With reference to

---

[3] Magento's proposed construction also clarifies that the runtime engine is "executed at runtime in the browser." *See, e.g.*, ECF No. 61-3, '168 patent at 65:3-5 (claim 1) ("[a] browser *with access to a runtime engine* is configured to generate the web-site"); '397 patent at 45:33-37 ("cause the browser to immediately execute the run time engine"); ECF No. 61-8 at 10 ("[T]he claimed invention is for an apparatus that produces and generates websites *within a browser. . . .* The websites are generated *by the runtime engine* reading and interpreting the external database and then building the web pages dynamically.") (emphasis added).

Figure 25, which "describes the techniques used to create a customized and optimized run time engine," the specification teaches that a "customized run engine and a library of the referenced run time classes are ***compiled and converted into byte code*** at 165. Finally, the run time engine for the website is created at 166." '397 patent at 43:28-31. The specification clarifies that what is created is a "'Websitename'.class customized run time engine file." '397 patent at 44:47-50. A ".class" file is a file containing Java bytecode, which is the instruction set of the JVM—the only virtual machine mentioned in the specification. Greenspun Decl. ¶¶ 38, 69. Thus, the specification clearly teaches that the runtime engine is previously compiled code in the instruction set of the virtual machine. Contrary to Express Mobile, this is not merely one embodiment where the runtime engine "happens to be" compiled—the runtime engine is always compiled.

The prosecution history also resolves this issue in Magento's favor. First, the applicant unambiguously stated that the runtime engine generates commands to a virtual machine:

> As described in the specification of the claimed invention, the database contains user settings, which may be thought of as attributes of display objects. ***The run time engine is used to accept the attributes and generate virtual machine commands, which then generate a display.***

ECF No. 61-4 at 5 (emphasis added). As explained, a POSA would know that virtual machine commands must be in compiled code: the instruction set of the virtual machine.[4]

Second, the applicant distinguished the Faustini patent during prosecution on the ground that the "web pages generated by Faustini result from a Faustini run time engine" that contains "all of the information necessary to generate a display" of the webpage, whereas the "claimed invention generates web pages using two features: a run time engine and a database of user settings." *Id.* at 5. The applicant argued that, by "stor[ing] the attributes of the display separately from the run-time code," the invention "permitt[ed] the user of the claimed invention to change the attributes of the web page without requiring a ***recompilation*** of the run-time code." *Id.* (emphasis added). The applicant's argument that the invention beneficially avoids "***re***compilation of the run-time code"

---

[4] These prosecution statements also confirm that compiled code in the runtime engine "is executed by the virtual machine to display a web page or website." Greenspun Decl. ¶¶ 76-77. Express Mobile's proposed construction only vaguely states that the runtime engine "generates commands to display a web page or website."

1   (*i.e.*, the runtime engine) would make no sense unless the runtime engine had to be compiled in the

2   first place. Greenspun Decl. ¶ 71. Express Mobile's argument that the runtime engine is not

3   compiled is contrary to statements made to the Patent Office and should be rejected.

4        Finally, the Court should reject Express Mobile's arguments that Magento's construction

5   adds "extraneous words that are not necessary for the interpretation of the claim." Op. Br. 20.

6   Magento's construction, though it seems wordy, tries to ensure the Court is not faced with a further

7   dispute about what this term means. *See O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*, 521

8   F.3d 1351, 1361 (Fed. Cir. 2008) (claim construction should "resolve the parties' dispute").

9        **2.    The "runtime engine" reads the claimed "database."**

10        The claimed runtime engine also "reads information from the database" to generate a

11   webpage or website, as proposed by Magento and overwhelmingly supported by the intrinsic record.

12   Greenspun Decl. ¶¶ 72-77. Express Mobile's proposed construction states that a runtime engine

13   merely "facilitates retrieval of information from the database," which is meaninglessly vague and

14   contradicted by the intrinsic evidence. Express Mobile did not address this issue in its brief.

15        The context of "runtime engine" in '168 patent claim 1 is as follows:

16
17         wherein the database is produced such that a web browser with access
      to a runtime engine is configured to generate the web-site from the
      objects and style data extracted from the provided database

18   The specification confirms it is the runtime engine that extracts "objects and style data from the

19   provided database." For example, Figure 2 states that the "run engine ***reads database*** and executes

20   the entire web site." In discussing Figure 2, the specification states:

21         The web page(s), when viewed by a web surfer, are activated by the
      browser calling the customized run time engine at 10. ***The run time***
22         ***engine then begins to read the database*** and download image, audio
      and video files, while simultaneously drawing the first web page for
23         viewing or user interaction at 11.

24   '397 patent at 5:57-62 (emphasis added). Figure 29, which describes how the database is read, states

25   that the "runtime engine reads a param value which points to the database and ***initiates the read***

26   ***operation***." In discussing Figure 29, the specification teaches:

27         ***FIG. 29 shows the techniques employed by the run time engine to***
      ***read the external database and to generate the necessary web page***
28         ***objects*** (35 of FIG. 4). The run time engine reads a "PARAM" value at

186, from HTML Code that was generated above (see FIG. 26), which points to the "Websitename" .dta external database that is compressed into the JAR or CAB File (that was loaded and accessed in FIG. 28). *The run time engine then initiates the read operation*. In one implementation, the read technique is always non-privilege. *If permitted by the current browser as a non-privileged operation, the "Websitename".dta file will be extracted and read from the CAB/JAR file residing in temporary local storage. If not, the run time engine will read the "Websitename". dta file directly from the server*.

'397 patent at 45:44-57 (emphasis added). Thus, the specification is clear that the runtime engine reads the database. It does not merely "facilitate retrieval of information from the database."

The prosecution history is also unambiguous on this point. In the process of distinguishing the Faustini patent, the applicant stated as follows:

[T]he claimed invention is for an apparatus that produces and generates websites within a browser. The invention accomplishes this by first creating the runtime files. *The websites are generated by the runtime engine reading and interpreting the external database* and then building the web pages dynamically.

ECF No. 61-8 at 10 (emphasis added). Magento's construction is consistent with these disclosures.

**C.     "at least one run time file" –'397 Patent Claims 1-2; "one or more run time files" –'397 Patent Claim 37**

| Express Mobile's Proposed Construction | Magento's Proposed Construction |
|---|---|
| one or more files, including a run time engine, that are downloaded or created when a browser is pointed to a web page or website | One or more files, including a run time engine, that are downloaded and executed by a browser to display a webpage when the browser is pointed to a web page |

The parties' primary differences in their proposed constructions of "at least one run time file" are (1) does a run time file have to be created before the browser is pointed to the webpage (it does); and (2) can a file that is not executable be a run time file (it cannot).

**1.     Run time files are created before a browser is pointed to a webpage.**

Express Mobile's construction wrongly states that run time files can be "created" when a browser is pointed to a web page. The intrinsic evidence is clear that the run time files already exist when a browser is pointed to a webpage. Greenspun Decl. ¶¶ 79-81.

The claims themselves do not refer to "creating" run time files when a browser accesses the webpage, but rather, imply that the run time files already exist.

11

- ’397 patent claim 1(e): "building one or more web pages to generate said website from at least a portion of said database and at least one run time file"
- ’397 patent claim 2(d): "a build tool having at least one run time file for generating one or more web pages"
- ’397 patent claim 37(c): "a build tool to construct one or more web pages of said website having . . . one or more run time files"

The specification similarly teaches that runtime files are created before the browser is pointed to the webpage. In particular, the specification teaches that after the website is designed a "run time generation process" creates the run time files, which are then loaded to a website.

> ***A run time generation process is then invoked to create the necessary run time files at 8*** (including HTML shell, CAB/JAR files and a customized runtime engine) which are then loaded to a user's web site at 9. The web page(s), when viewed by a web surfer, are activated by the browser calling the customized run time engine at 10. The run time engine then begins to read the database and down load image, audio and video files, while simultaneously drawing the first web page for viewing or user interaction at 11.

’397 patent at 5:53-62; *see also id.* at 8:9-36; Fig. 4b steps 30-33B (outlining "run generation process" 360). Only after the run time files are created and loaded to the website does a "run time process" occur wherein runtime files are used to display webpages, starting after "[a] web surfer points a browser at the HTML shell file" (*i.e.*, when a browser is pointed to the webpage URL). ’397 patent 45:6-7; *see also* Fig. 4b steps 34-38 (outlining "run time process" 365). Hence, the Court should reject Express Mobile's "or created" language.

### 2. Files that cannot be executed are not run time files.

Express Mobile's only complaint with Magento's construction is that it requires a "run time file" to be executed, whereas Express Mobile argues a run time file could be a non-executable data file like image, audio, or video. Express Mobile's argument contradicts unambiguous intrinsic evidence. Greenspun Decl. ¶¶ 82-84.

The claims require run time files to utilize information stored in the claimed database to generate virtual machine commands for displaying a webpage. Data files like images, audio, and video cannot do this, so they are not run time files as claimed. *Id.* ¶ 82.

12

- ’397 patent claim 1(e):  “where said at least one run time file utilizes information stored in said database to generate virtual machine commands for the display of at least a portion of said one or more web pages.”

- ’397 patent claim 2 (d):  “at least one run time file for generating one or more web pages, said run time file operating to utilize information stored in said database to generate commands to said virtual machine for generating the display of at least a portion of said one or more web pages.”

- ’397 patent claim 37:  “one or more run time files, where said run time files utilize information stored in said external database to generate virtual machine commands for the display of at least a portion of said one or more web pages.”

During prosecution of the ’397 patent the applicant also unambiguously limited the scope of “run time files” to a runtime engine, which is a file that is executable. In its efforts to overcome Faustini, the applicant argued as follows:

> In particular, ***the pending claims now recite that run time files utilize information stored in the database***, which contains information representative of said one or more user selected settings, to generate virtual machine commands for the display of at least a portion of a web page. Support for this is found in the specification, for example in the section tiled [sic] “Run Time Process” beginning on page 60 of the specification. ***In particular, see the discussion of Figure 29 beginning on page 61, where the use of the run time engine to use database information to generate displays is discussed in detail.*** . . .

> In particular, web pages generated by Faustini result from a Faustini run time engine which is an interpreted or executable file, such as virtual machine commands, and which contains within the Faustini run time code all of the information necessary to generate a display (the display data is embedded within the Faustini run time code). ***In contrast, the claimed invention generates web pages using two features: a run time engine and a database of user settings.*** As described in the specification of the claimed invention, the database contains user settings, which may be thought of as attributes of display objects. ***The run time engine is used to accept the attributes and generate virtual machine commands, which then generate a display.***

ECF No. 61-4 at 5 (emphasis added). The applicant thus explained to the Patent Office that the claimed “run time file” is only one of the types of run time files mentioned in the specification—the runtime engine. Express Mobile does not dispute that the runtime engine is a necessary runtime file.

13

D.      **"database" – '397 Patent Claims 1, 2, 3, 9, 14, and 37; '168 Patent Claim 1**

| Express Mobile's Proposed Construction | Magento's Proposed Construction |
|---|---|
| an electronic information storage system offering data storage and retrieval | An electronic information storage system offering data storage and retrieval, that stores information on a record-by-record basis, each record divided into one or more fields, with functions for searching and sorting the records |

Express Mobile's proposed construction is overbroad and unsupported by the intrinsic or extrinsic evidence. It was well known to a POSA that databases at the time of the alleged invention stored information on a record-by-record basis, where the records are divided into fields, and that the records could be searched and sorted. Greenspun Decl. ¶¶ 86-88. Without functionality to sort and search the information contained in the database, a "database" would just be a collection of data.

Magento's proposed construction is consistent with the specification, which evidences no intent to restrict the term "database" from its plain and ordinary meaning to a POSA. The specification notes that "a full array of database operations" are available and that "[s]upport for popular databases (such as Oracle, Informix, Sybase and DB2) are available on a real time interactive basis." '397 patent at 33:27-34. These databases called out in the specification all included functionality to search and sort records. Greenspun Decl. ¶ 88. Notably, Express Mobile's expert does not dispute that databases at the time of the alleged invention stored information on a record-by-record basis, where each record is divided into one or more fields, as Magento proposes. He does not dispute that databases at the time existed with functions for searching and sorting records. He also does not dispute that databases at the time all had functions to search the records of the database. He merely asserts that "not all databases of the time had the capability of '*sorting*' files," without citing any supporting evidence. The hypothetical database contemplated by Dr. Turnbull, which can search records but apparently not sort them, would not be able to yield a phone book sorted by last name or even present records in chronological order. *Id.* ¶ 89.

Magento's proposed construction is consistent with the specification and underscored by the understanding of a POSA. Express Mobile presents no evidence to the contrary. Magento's proposed construction, which includes that the database's information be stored "on a record-by-record basis, each record divided into one or more fields, with functions for searching and sorting the records,"

14

1    should be adopted.

2        E.    **"contemporaneously" – '397 Patent Claim 37**

3

| Express Mobile's Proposed Construction | Magento's Proposed Construction |
|---|---|
| happening at the same period of time | Occurring immediately after, from a human perspective |

4

5        Express Mobile does not dispute that the term "contemporaneously" as used in the claims

6    should be judged "from a human perspective," as Magento proposes.  Nowhere does Express Mobile

7    argue that this is incorrect. Indeed, in its claim construction briefs submitted to the Texas court in

8    another case, Express Mobile argued that the proper construction should include the phrase "from a

9    human perspective" because "the intrinsic record confirms that this is how 'contemporaneously'

10   should be measured." Langford Ex. D at 21. Express Mobile further argued:

11            [A]s the user selects settings for the web site during the creation
              process, the system updates the display "contemporaneously" as the
12            settings are accepted. . . . The specification describes how this process
              happens. Specifically, it teaches that, in the preferred embodiment, a
13            polling technique is used to determine if the user has made changes.
              (Ex. 1 ['397 patent] at FIG. 9; 22:66-34:3.) If so, then the system
14            shows those changes. (*See, e.g.,* 24:32-36; 41-45; 52-54; 57-59.)
              Importantly, the specification teaches that the results appear
15            "contemporaneously" *from a "human perception" or "ergonomic"
              point of view*. . . . (Ex. 1 at 23:21-27.)
16

17   *Id.* at 21-22 (emphasis added). Thus, there is no dispute that Magento's proposal to include the

18   phrase "from a human perspective" as part of the construction of this term is correct.

19       The dispute, then, centers on whether "contemporaneously" simply means "happening at the

20   same period of time," as Express Mobile proposes, or whether in the context of the patent it means

21   "occurring immediately after," as Magento proposes. The intrinsic and extrinsic evidence make clear

22   that Magento's proposal is accurate while Express Mobile's contradicts the evidence.

23       The term "contemporaneously" is used alone in claim 37 of the '397 patent: "said interface

24   being operable through the browser on the computer to: present a viewable menu of a user selectable

25   panel of settings, accept a plurality of settings from said user selectable panel of settings to form an

26   assembly of settings, and generate the display in accordance with said assembly of settings

27   *contemporaneously* with the acceptance thereof." '397 patent at 68:48-56 (emphasis added). The

28

claim language itself, by specifying that the display is generated "in accordance with said assembly of settings contemporaneously with the acceptance thereof," dictates a sequence of events. First the user selects settings, and then the display is generated according to the settings. Magento's proposal makes this claim-driven sequence clear. Express Mobile's, by contrast, contemplates that these events would occur "at the same period of time." But this contradicts the claim language because the user selecting a setting must happen *before* the display is generated based on the setting, and those two events cannot happen at the same time or in an overlapping period of time. Greenspun Decl. ¶¶ 91-94.

Magento's proposal is also supported by the specification. The term "contemporaneously" does not appear in the specification, but from its teachings a POSA would readily understand that "contemporaneously" refers to immediately updating the display after the user selects a setting. *Id.* ¶¶ 95-96. Express Mobile has essentially admitted this, stating in its claim construction brief before the Texas court: "The specification describes how this process happens. Specifically, it teaches that, in the preferred embodiment, a polling technique is used to determine if the user has made changes. (Ex. 1 ['397 patent] at FIG. 9; 22:66-34:3.) If so, then the system shows those changes. (*See, e.g.,* 24:32-36; 41-45; 52-54; 57-59.)." Langford Ex. D at 21. The specification elsewhere likewise describes a sequence of events where a user selects a setting and updates to the display immediately follow. *See, e.g.,* '397 patent at 10:49-52 ("One or more settings can be changed through a pop-up window, with the results *immediately processed* by the build engine 352 *and displayed* in the build frame 500.") (emphasis added), 13:39-41, 16:59-60, 23:21-27 ("A polling loop is defined in the panel's (panel 400) JavaScript that *creates a near continuous, at least from a human perception point of view, dynamic real time link*, in order to monitor events occurring inside the build engine. The result is a *real time retrieval (from an ergonomic perception point of view)* of necessary data and status settings from the build engine back to the interface.") (emphasis added).

Magento's proposed construction is consistent with the extrinsic evidence as well. A POSA would understand that "contemporaneously" means "occurring immediately after, from a human perspective," as used in claim 37 and in the context of the WYSIWYG browser-based website editor

16

described in the specification.[5] *See* Greenspun Decl. ¶ 97. The benefit of a WYSIWYG editor was that results of a user's selected settings were reflected immediately after selection. *Id.* The Microsoft Computer Dictionary from 1999 notes that a "WYSIWYG language is often easier to use than a markup language, which provides no immediate visual feedback regarding the changes being made." *Id.* ¶ 98 (citing ECF No. 61-18 at 487). Similarly, the prior art Faustini patent, which was extensively discussed in the prosecution history, teaches that a WYSIWYG environment is one where "immediate feedback of status and value information is available." *Id.* ¶ 99 (citing ECF No. 61-5 at 135:62-136:4).

The fact that another court construed this term to mean what Express Mobile now proposes does not solve the issues with Express Mobile's proposed construction. Rather, that construction only creates confusion because it does not specify what perspective "contemporaneously" is judged from—when both parties have agreed it is a human's perspective.

F.     **"substantially contemporaneously" — '397 Patent Claims 1 and 2**

| Express Mobile's Proposed Construction | Magento's Proposed Construction |
| --- | --- |
| happening at the same period of time from a human perspective | Indefinite |

Express Mobile apparently views the difference between "contemporaneously" and "substantially contemporaneously" to come down to whether it is from a human perspective or not. However, it points to absolutely no support for this notion, and as discussed above, the term "contemporaneously" properly is viewed from a human perspective, as Express Mobile concedes. Thus, under the logic of Express Mobile's positions, there is no difference between the two terms, and the term "substantially" has no meaning. This only confirms the term is indefinite.

Claim terms like "substantially contemporaneously" that call for a subjective, eye-of-the-beholder judgment call are routinely found indefinite because they do not advise the public of the scope of the patent. *E.g.*, *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1364 (Fed. Cir. 2018) ("minimal redundancy"); *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371-74 (Fed. Cir. 2014)

---

[5] Notwithstanding that Express Mobile's expert declaration should be stricken, Dr. Turnbull did not address the term "contemporaneously" and Express Mobile has no evidence to support any other understanding of a POSA for this term.

("unobtrusive manner"); *Core Wireless Licensing S.A.R.L. v. Apple Inc.*, Case No. 15-cv-05008-PSG, 2016 WL 3124614, at *12 (N.D. Cal. June 3, 2016) ("substantially impair the quality").

Here, nothing in the specification "supplies some standard for measuring the scope of the phrase." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2004), *abrogated on other grounds by Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014). The term does not appear in the specification. It is not a term used in the art. A POSA would thus view it as a purely subjective term with no reasonable certainty as to its scope or meaning. Greenspun Decl. ¶ 101. The citations to the specification that Express Mobile points to are the same ones that it pointed to in its Texas case as relevant to the construction of "contemporaneously." Langford Ex. D at 22. Once again, taking Express Mobile's positions at face value, the term "substantially" has no meaning, further confirming that a POSA would be unable to discern the meaning of the term with any reasonable certainty.

Nor does Express Mobile's expert explain what the term means. It appears, rather, that he first addresses an argument raised by a defendant in the another case, as Magento has not raised any argument about "some metaphysical timetable taking place at the processor level." ECF No. 61-19 ("Turnbull Decl.") ¶ 87. The other brief paragraphs in his declaration do not explain the difference from "contemporaneously" or exactly how, or why a POSA would understand "substantially contemporaneously" with reasonable certainty. *See id.* ¶¶ 86, 88-89. Rather, his opinion effectively concedes the point made by Dr. Greenspun—there is no objective meaning to the term and it is nothing more than a subjective, uncertain term. Greenspun Decl. ¶¶ 102-07.

Finally, the cases Express Mobile points to do not advance its position. These cases found the term at issue indefinite (*Interval Licensing*) or rely on intrinsic record guidance that assisted a POSA to recognize when a claim limitation is satisfied (*Pall Corp. v. Micron Seps.*, 66 F.3d 1211 (Fed. Cir. 1995) and *ONE-E-WAY, INC. v. Int'l Trade Comm'n*, 859 F.3d 1059 (Fed. Cir. 2017)), which is missing in this claim term that calls for a subjective human judgment without any guidance. Express Mobile's attempt to claim that it has acted as its own lexicographer is contrary to the law—there is no definition in the specification. The term is not even mentioned in the specification. *E.g.*, *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1366 (Fed. Cir. 2002) (to rely on lexicography the

18

1   patentee must "clearly set forth a definition of the disputed claim term in either the specification or

2   the prosecution history").

3       The term "substantially" adds no meaning to the term "contemporaneously," and as viewed

4   from the perspective of a POSA, the phrase "substantially contemporaneously" is indefinite.

5       G.    **"button" — '397 Patent Claims 6, 9, 14, 17, and 20; '168 Patent Claims 1-3**

| Express Mobile's Proposed Construction | Magento's Proposed Construction |
|---|---|
| a graphic object that, when activated, performs a specified function | Graphical element that performs a specific operation when activated by a mouse click **or mouse over** |

9       Magento's proposed construction again best comports with the claim language, the

10   understanding of a POSA, and the specification. In contrast, Express Mobile's expansive

11   construction would cover all graphical objects that perform a specified function when activated,

12   regardless of *how* the object is activated. *See* Greenspun Decl. ¶¶ 108-10.

13       It is true that the specification identifies an additional user interaction—a mouse over—that

14   can activate a button. Thus, Magento has amended its proposed construction to take that user

15   interaction into account. However, the point remains that mouse over and click interactions are the

16   only means identified in the specification by which a button may be "activated." *See, e.g.*, '397

17   patent at Fig. 16 (identifying "mouse over" and "mouse down" states); Fig. 36 (again, specifying

18   "mouse over" and "mouse down"/click responses). Without defining activation, Express Mobile's

19   proposed construction would permit activation by any means, not just user interaction. For example,

20   an animation that automatically plays when a website is finished loading would be within the scope

21   of Express Mobile's construction though no POSA would consider such a graphical element to be a

22   "button." Greenspun Decl. ¶ 109. The Court should adopt Magento's proposed construction as the

23   one that fits the intrinsic record and the plain and ordinary meaning of "button."

24       H.    **"settings" – '397 Patent Claims 1, 2, 9 and 37**

| Express Mobile's Proposed Construction | Magento's Proposed Construction |
|---|---|
| an attribute of an object available for selection | An attribute of a web site element available for selection |

27       The sole difference between the parties' proposed constructions is that Magento's is true to

28

the claim language of the '397 patent, which refers to "settings describing **elements on a website**,"— not objects. *See, e.g.*, '397 patent at 65:48 (emphasis added). Nonetheless, Magento is willing to accept Express Mobile's proposed construction.

I.   **"multimedia objects" – '397 Patent Claims 4 and 5**

| Express Mobile's Proposed Construction | Magento's Proposed Construction |
|---|---|
| the combination of data including colors, fonts, images, audio clips, video clips, text areas, URLs and thread objects, sound, graphics, animation and/or video that is treated as a discrete entity | Indefinite |

The term "multimedia objects" is indefinite. Express Mobile's proposed construction does not make sense in the context of the claim language, is contradicted by the specification, and is inconsistent with the understanding of a POSA.

First, claims 4 and 5 of the '397 patent, where the term "multimedia objects" appears, state:

4. The apparatus of claim 3, wherein said representative information is Boolean data, numeric data, string data or multi-dimensional arrays of various multimedia objects.

5. The apparatus of claim 4, wherein said elements include multimedia objects selected from the group consisting of a color, a font, an image, an audio clip, a video clip, a text area and a URL.

The claims do not contemplate "thread objects, sound, graphics, animation and/or video that is treated a discrete entity" or that a multimedia object would be any "combination of data including" items in the "and/or" list in Express Mobile's proposal.

Second, the specification certainly lists non-exclusive examples of "multimedia objects," for example, they "include colors, fonts, images, audio clips, video clips, text areas, URLs, and thread objects." '397 patent at 2:5-10, 42:40-55. "However, that the specifications provide these examples does not mean that the patents provide an objective standard for determining what is meant by the term . . ." *Prolifiq Software Inc. v. Veeva Sys. Inc.*, No. C 13–03644 SI, 2014 WL 3870016, at *6 (N.D. Cal. Aug. 6, 2014). "Moreover, to determine the scope of a claim, a person skilled in the art must know not only what falls inside the scope of the claim term, but also what falls outside of it." *Id.* That is the real indefiniteness problem here.

The word "multimedia" had a clear ordinary meaning to a POSA at the time of the alleged invention: multiple types of media, i.e., the "combination of sound, graphics, animation, and video," and examples in the specification contradict the ordinary meaning of the term—for example, a color, a font, a thread object. Greenspun Decl. ¶¶ 112-14. The upshot is that the specification is clearly using "multimedia objects" in an unusual sense but provides no guidance about what the term means beyond the odd examples, rendering the scope of the term indefinite. (*Id.* ¶ 115-17.) Express Mobile cannot rely on the lexicographer doctrine to save the term because the specification does not "clearly set forth a definition" of the term "multimedia objects," only non-limiting examples that invoke words like "include" and "etc." *CCS Fitness*, 288 F.3d at 1367; *see also Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1302 (Fed. Cir. 2006) (noting that "included" is a "non-limiting word"). There is no disclosure that these examples define the boundaries of the term "multimedia objects." There is also no disclosure that these examples are meant to be used in combination as a "combination of data," as Express Mobile suggests. Indeed, there is no specification support for the "combination of data" portion of Express Mobile's proposed construction at all. There is likewise no specification support for including the phrase "that is treated as a discrete entity" in the construction, and Express Mobile points to none.

It is hopelessly unclear to a POSA, in view of the confusing examples provided by the specification, what is encompassed by "multimedia objects." If something as different as a font, a thread object or a URL can be considered to be a multimedia object, then there is no way for a POSA to know with reasonable certainty where the boundaries of a multimedia object lie. Express Mobile's expert did not opine on the term. And if multimedia objects may have such an expansive definition, then in effect Express Mobile's proposed construction boils down to a "combination of data…that is treated as a discrete entity." *See* Greenspun Decl. ¶¶ 118-20.

J.     **"timelines" / "time lines" – '397 Patent Claims 11, 14-15, 17 and 20; '168 Patent Claims 1 and 3**

| Express Mobile's Proposed Construction | Magento's Proposed Construction |
|---|---|
| Independent asynchronous processes that defines the values for an object, including its appearance, animation, speed, and/or resolution at one or more defined times | A sequence of changes that define the attributes of a text button or image object as the changes occur |

21

1        Express Mobile's construction is again overbroad. The specification states that "[a] timeline

2   is an independent asynchronous process that defines the existence of a given text button or image

3   object." '397 patent at 36:50-52. Magento's construction comports with the specification's express

4   definition of "time line" and further clarifies, in plain terms, what an "independent asynchronous

5   process" is in the context of defining a text button or image object's "existence." *See* Greenspun

6   Decl. ¶¶ 121-25. Express Mobile impermissibly expands the patentee's lexicography in two ways:

7   (1) sweeping in undefined "object[s]" beyond text buttons and image objects; and (2) permitting the

8   time line to define a single object attribute at a single point in time, which contradicts the teaching of

9   the specification and common sense that a time line is a *process*.

10        The Federal Circuit has stated that "the word 'is,' again a term used here in the

11   specification, may 'signify that a patentee is serving as its own lexicographer.'" *Sinorgchem Co.,*

12   *Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) (quoting *Abbott Labs. v.*

13   *Andrx Pharms., Inc.*, 473 F.3d 1196, 1210 (Fed. Cir. 2007)). Here, the patentee acted as his own

14   lexicographer by stating that a "time line ***is*** an independent asynchronous process that defines the

15   existence of a given text button or image object." '397 patent at 36:50-52 (emphasis added);

16   Greenspun Decl. ¶ 122. "As such, the patentee must be bound by the express definition."

17   *Sinorgchem*, 511 F.3d at 1136; *accord France Telecom, S.A. v. Marvell Semiconductor, Inc.*, No. 12-

18   CV-04967-WHO, 2014 WL 1007449, at *4 (N.D. Cal. Mar. 12, 2014).

19        Express Mobile attempts to escape the express definition in the specification by pointing to

20   Figure 19 in the patents and inviting the Court to do a word search for the phrase "object time line."

21   *See* Op. Br. 34-35. But none of the passages it cited or invoked are inconsistent with the express

22   definition, which unambiguously limits time lines to text button or image objects. *See Multiform*

23   *Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998) ("When the specification

24   explains and defines a term used in the claims, without ambiguity or incompleteness, there is no

25   need to search further for the meaning of the term.").

26        The specification is clear that "FIG. 19 describes ***the text button and image*** time lines and

27   technology utilized by the build engine (27 of FIG 3)." '397 patent at 36:48-50 (emphasis added).

28   Likewise, the specification's descriptions of object time lines confirm that attributes defined by those

time lines, such as animations and transformations, are naturally applicable to text button and image objects. *See, e.g.*, *id.* at Fig. 33; 36:45-50 ("The run time technology behind ***image and text button object transformations*** is described in greater detail below in association with FIG. 31 through FIG. 35."); 36:59-60 ("An ***image or text button object time line*** can spawn child time lines, at a designated moment."); 52:30-32 ("Returning to FIG. 31, the main web page thread's run method then executes ***a text button and image object time line***, transformation and animation loop at 206."); 60:39-41 ("Either ***a text button child time line thread or an image child time line*** thread, or both, can be spawned at this time.") (emphases added). Contrary to Express Mobile's assertion, the specification's reference to integrating a "thread object" with "the object time line technology" does not expand the express definition to include other objects, as subsequent passages make clear that threads are used to execute time lines and are not defined by them. *See id.* at 52:30-32 ("Returning to FIG. 31, the main web page thread's run method then executes a text button and image object time line, transformation and animation loop at 206."). Thus, although the express definition in the specification could properly mandate a construction that excludes embodiments that are inconsistent with its unambiguous language, *Sinorgchem*, 511 F.3d at 1138, Magento's proposed construction is entirely consistent with the disclosures in the specification.

Second, Express Mobile does not even attempt to reconcile the inconsistency in its proposed construction. Express Mobile's proposed construction allows a timeline to define one attribute of a text button or image object a single time. Under Express Mobile's construction, for example, a value that solely specifies the size of an image at the time a webpage loads would be a "timeline" even if no subsequent attributes are defined. Greenspun Decl. ¶ 127. To the contrary, the specification states that "[a]n object's time line ***begins*** at the time a given web page makes its appearance, either through an immediate draw or through a transition animation." '397 patent at 36:50-64 (emphasis added). That is, a time line is a *process* that dictates more than one change at more than one time. It cannot simply be a single point in time. Greenspun Decl. ¶ 127.

## V. THE DECLARATION OF EXPRESS MOBILE'S EXPERT, AS WELL AS ITS OVERLONG BRIEF, SHOULD BE STRICKEN

Magento respectfully requests that the Court strike the declaration of Express Mobile's

23

expert, Dr. Turnbull, as well as the last 10 pages of Express Mobile's 35-page opening claim construction brief. Express Mobile's serial rule violations should not be permitted to continue.[6]

Courts may enforce the Patent Local Rules under Federal Rule of Civil Procedure 16(f) or 37(b)(2). *See O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1363 (Fed. Cir. 2006). Courts may also sanction untimely disclosure of claim construction expert testimony under Rule 37(c)(1). *Tristrata, Inc. v. Microsoft Corp.*, Case No. 11-CV-03797-JST, 2013 WL 12172909, at *2 (N.D. Cal. May 13, 2013). Sanctions are appropriate unless the failure was "substantially justified" or "is harmless." Fed. R. Civ. P. 37(c)(1). The burden of showing either falls on the non-moving party. *Tristrata*, 2013 WL 12172909, at *3. The Court may also exercise its discretion and decline to consider a claim construction declaration for failure to comply with the Patent Local Rules. *Largan Precision Co., v. Fujifilm Corp.*, No. C 10-01318 SBA, 2012 WL 4097719, at *4 (N.D. Cal., Sept. 17, 2012).

Throughout these claim construction proceedings Express Mobile has treated the requirements of the Patent Local Rules as mere friendly suggestions, not Court orders. The Patent Local Rules have straightforward requirements for disclosing the testimony of a claim construction expert and Express Mobile ignored them, at Magento's expense. On February 19, 2018, the parties exchanged Patent L.R. 4-2 disclosures of preliminary claim constructions and extrinsic evidence. Contrary to the express requirements of Patent L.R. 4-2(b), in its Patent L.R. 4-2 disclosure, Express Mobile did not identify any expert witness by name or provide any details about what a potential expert witness's opinions would be. Instead, for every claim term, Express Mobile provided a perfunctory statement that "Express Mobile may rely on the testimony of an expert to establish the meaning of this term to a person of ordinary skill in the art." Langford Ex. Ex. E. Express Mobile also did not produce any supporting extrinsic evidence until the following afternoon. Langford Ex. F. On April 6, 2018, the parties filed their Joint Claim Construction and Prehearing Statement ("JCCPS") pursuant to Patent L.R. 4-3. ECF No. 59. Contrary to the requirements of

---

[6] Express Mobile also submitted an undisclosed declaration of percipient witness Steve Rempell, but Magento does not seek to strike this declaration as it provides only background information. Nonetheless, to the extent Express Mobile attempts to rely on Mr. Rempell's declaration to support any of its claim construction positions, Mr. Rempell's declaration should also be stricken.

1   Patent L.R. 4-3, Express Mobile again did not identify any expert by name or describe the opinions

2   of any expert. Instead, it again stated, for every claim term, that "Express Mobile may rely on the

3   testimony of an expert to establish the meaning of this term to a person of ordinary skill in the art."[7]

4   ECF No. 59-2.

5           On April 20, 2018, Express Mobile filed its Opening Claim Construction Brief,

6   accompanied by the previously undisclosed, 19-page Turnbull Declaration. ECF Nos. 61-19 to -21.

7   Express Mobile had never before identified Dr. Turnbull to Magento or provided any information

8   about what Dr. Turnbull's opinions would be. Express Mobile also submitted a 35-page brief

9   without seeking the Court's consent, grossly exceeding the 25-page limit set by Civil L.R. 7-2(b).

10          Express Mobile's serial disregard for the rules should not be indulged. Having failed to even

11  confirm that it would be relying upon an expert before filing the Turnbull Declaration with its claim

12  construction brief, Express Mobile blatantly violated the Patent Local Rules and forced Magento to

13  determine, in the midst of claim construction briefing, whether and how to respond to Dr. Turnbull's

14  previously undisclosed opinions. Express Mobile's election to file a 35-page brief in contravention

15  of the local rules has further prejudiced Magento's response, which complies with the length

16  required by the local rules. Dr. Turnbull's declaration should accordingly be stricken and

17  disregarded in these claim construction proceedings, and Magento likewise respectfully requests that

18  the Court strike and disregard the last 10 pages of Express Mobile's overlong brief. *See Largan*

19  *Precision Co., Ltd.*, 2012 WL 4097719, at *4 (declining to consider claim construction expert's

20  declaration where JCCPS stated the party "may call one or more experts" but did not identify the

21  expert by name or provide summary of opinions).

22  **VI.    CONCLUSION**

23          For the reasons stated above and in the accompanying Greenspun Declaration, the Court

24  should adopt Magento's proposed constructions of the disputed claim terms.

25  Dated: May 4, 2018                          SIDLEY AUSTIN LLP

26                                              */s/ Irene Yang* _____

27  ---

    [7] On April 9, 2018, the parties filed a minor errata to their JCCPS, but Express Mobile's boilerplate
    statement about possible expert testimony remained unchanged. ECF No. 60.

28

1
2
3
4
5
6

Michael J. Bettinger (SBN 122196)
mbettinger@sidley.com
Irene Yang (SBN 245464)
irene.yang@sidley.com
Sue Wang (SBN 286247)
sue.wang@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, California 94104-1715
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

7
8
9
10

Andrew T. Langford (*pro hac vice*)
alangford@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone:  (214) 981-3300
Facsimile:  (214) 981-3400

11

Attorneys for Plaintiff Magento, Inc.

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

26

MAGENTO'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
CASE NO. 3:17-cv-02605-RS